All rise. Illinois County Court of Oral Provision is now in session. Your Honorable Justice W. Devin. Sorry, Devin Devin. Thank you, ma'am. It's okay. W. Ellis, there we go. Good morning, everyone. Please be seated. Could we call the first case, please? Or the only case? 15-1765, Peoples v. Wendell Brownson. Will the attorneys presenting argument please approach and introduce yourselves. If you could spell your last names, please. Good morning. Melissa Matuzak, M-A-T-U-Z-A-K, appearing on behalf of the Attorney General, Wendell Brownson. Good morning, Your Honor. Justin Duvall. He is an employee, A-L-L, Assistant State's Attorney on behalf of the Peoples. Okay. Thank you very much. We're going to allocate 15 minutes per side. We can be flexible with that sometimes. And I would assume the defendant would like it. Ms. Matuzak, you'd like a few minutes for rebuttal? Yes. Sure. We can do whatever you're going to need. Okay. Very good. Thank you very much, Ms. Ball and Ms. Matuzak, whenever you're ready. May it please the Court, counsel. My name is Melissa Matuzak. I represent Wendell Robinson on this appeal. It's an appeal from denial of post-conviction relief following a third stage evidentiary hearing. I also represented Mr. Robinson in the proceedings in the trial court. Mr. Robinson was convicted of the 1992 shooting death of Larry Walker. I'm aware of one person, and that man's name is James Barnes. Mr. Barnes has since recanted his testimony. He's admitted that he made up the identification of Wendell Robinson. Mr. Robinson was charged in the shooting death of Larry Walker based on a statement made by James Barnes and additionally by a statement signed by a witness named Stephen Hurd. It was Hurd's statement that triggered the approval. Well, it triggered the approval of the state charging him. Yes. But he never testified at trial. He never testified at a motion to suppress. He never did anything. So is your point that Hurd's, because he recanted later, that somehow it unravels everything else? Well, it's the circumstances of his recantation. And it's important, and this is why. The felony review state's attorney refused to approve charges based on the word of James Barnes, who had, you know, James Barnes knew Wendell Robinson, so he had given two identifications at this point. He had identified him in a yearbook, and he identified him in a line-up. And by name. And by name. Four months after the shooting and only after Mr. Barnes was in custody. Up to that point, he had not named anyone, but he had been interviewed by the police several times. He had been interviewed by the police several times with regard to this murder or with regard to his drug dealing? No, with regard to this, well. I mean, he had been interviewed on a bunch of different things. He had been interviewed certainly in regard to drug dealing and weapons offenses because those cases were pending. I'm sorry. Glenn was questioned several times that there was a testimony of Detective Baiocchi at trial, that he had interviewed Mr. Barnes at least, I believe it was at least three times prior to Mr. Barnes naming Mr. Robinson. So the fact that Mr. Hurt didn't testify at trial, doesn't that hurt your argument? Because the trial court found that there was sufficient evidence based on Mr. Barnes' testimony alone. They didn't need Hurt. Well, and the trial court specifically found that he found Barnes credible. Barnes was the only person to identify. In fact, the Barnes testimony was the only evidence against Wendell Robinson. What about Carly? Didn't Carly say that looks like the guy? Yes, Carly eventually came around, but he, Mr. Carly was the victim's friend. He was standing next to the victim when the robbery and shooting happened. So he presumably got a pretty good look at the person who did the shooting. He did not identify Mr. Robinson in a lineup, and that was much closer to the event. That was in October of 92. The shooting happened in June of 92. You said he looked like him, right? At trial? At trial. And, you know, it's interesting. When you read his trial testimony, he continually refers to the man, the man with the gun, the defendant. But he's never asked to, and he never identifies Mr. Robinson until the court asks him. And with respect, it seemed highly improper that the court then said, are you referring to this man here? And points to Robinson, the defendant, at this table. Well, it doesn't take, you know, much for a person to say, yes, that's the person I need. But to Mr. Carly's credit, he couldn't do that. He said, well, it looks like the person, but he did not ever positively identify Mr. Robinson at trial. But to the point of Steve Hurd and his importance, I think that the importance of the charging decision would come into play at trial if the defense had known that Mr. Hurd later said that he lied. Because the trial judge specifically found, even though it is this conviction, I'm going to convict this man based on the testimony of just James Barnes, he specifically found him credible because he couldn't find anything untoward about his testimony. He couldn't find anything, any reason for him to lie. Now, the evidence that Steve Hurd later did, I lied, Barnes lied, you know, it was just an opportunity. For Hurd, it was more, I'm sick of talking to these police, so I'm just going to sign this statement. But both the defense and the prosecution had Hurd in custody, and they were going. He was there, and he was ready to testify for trial. The tax person talks to him and says, no, we don't want to call him. Well, he was there. He was brought in on a warrant. Well, because he didn't show up. Right, because he didn't show up, because he didn't want to testify. And he made it very clear to the police early on after the first police report saying that, I believe it was October 9th of 1992, saying, yes, this is true, it was Wendell Robinson, but I'm not going to sign anything. He agreed to come back. He never did. He agreed to see a lineup. He never did. He did not cooperate with the police. He didn't want to testify. And, in fact, he made that very clear at the evidentiary hearing as well. He was not interested in testifying. He signed the statement. Which is not terribly uncommon when all your witnesses are drug dealers or drug users. Absolutely. He was out on the street, you know, in the middle of a shooting. And, but the, sorry, I lost my train of thought there. Sorry, I didn't mean to cut you off there. But the warrant is stated to be material. Yes. Oh, so, and the question, I'm sorry, Your Honor's question was about trial counsel, Mr. Nichols, having interviewed Heard, and he decided not to call him. And, you know, the post-conviction court found that that was compelling evidence that, and I believe that the judge's words were that it was logical that Heard would have told defense counsel that he made up the story about Robinson. And so if, and that he would have, that it must have been, he told him that he had the information, trial counsel had the information, and he just decided not to use it. And, first of all, I believe Heard told him, yeah, your guy's the one who shot him. That's our other, we're going to speculate on what possibly happened in that interview. And, so, but he had already told the state that that was not the case. But then he came in and said, that's a lie. True. When I said we lied to Heard, that was a lie. Correct. But defense counsel was never given an opportunity to explore that. Defense counsel was never, I mean, we're talking about a case that comes down to the word of one person. And Mr. Heard was connected to that person. He was interviewed at the same time as that person. He knew him. They were working together on the day of the robbery. And, yes, it's possible that he could have stuck to the story, but it was Robinson. It's possible. These things are possible. He would have been impeached. He would have been impeached. So would Byron. So when we determine this material, we have to come to the conclusion that it would have changed the outcome of the trial. And you're saying that if we had presented these two lies, this trial, that that would have changed the outcome. I'm saying if Mr. Heard, if the evidence that Mr. Heard lied had been given to defense counsel and he had been able to. Lied twice. That he lied twice, that he would have been able, defense counsel would have been able to do something with that information to raise the specter of reasonable doubt because it involved James Barnes, because he could have possibly called the felony review state's attorney to find out why was it that James Barnes' word wasn't enough? How is that relevant? So you're going to call a state's attorney now to say what his impressions were at the time that they charged him? That has nothing to do with trial. The state can call whoever they want at trial to establish it, and they don't have to have any obligation to call the state's attorney unless they want to put the statement in. Well, the defense attorney has the right to have all of the information that's been given to the state. Well, he knew who the state's attorney was. Correct, but he didn't know that Stephen Heard. All he knew was that Stephen Heard had signed a statement implicating his client and then thereafter refused to cooperate, refused to testify, refused to do anything. Jill, I'm sorry, are you talking about the 1994 memo now? I'm talking about the 1994 conversation and the 1994 memo. Okay, so the attorney Nichols just didn't have it in the file, and we don't have any testimony from anyone saying that he never received it. That is correct, but we also don't have anything in the record to suggest that he did have that information. So we're going to speculate that the state hid this memo, and where are we getting that? There is nothing in the record to base that on. There is nothing in the record. Well, there is several sort of circumstantial pieces of evidence in the record. This memo was purportedly prepared in June of 1994, right before the trial started. I'm sorry, the interview took place purportedly in June of 1994, right before the trial started, and the memo was prepared July 16th in the middle of trial. There is nothing, there is no tendering of discovery. There was no, and in fact the state did tender other discovery in the middle of the trial because the defense moved for a mistrial, and the trial had to be continued. I would say that that is strong circumstantial evidence that he did not also receive this information about Steve Heard, because a reasonably competent defense attorney would have said, Judge, I've just received this information that one of, you know, an eyewitness to the shooting has admitted that he lied. I need time to investigate, I need time to... Don't you think that that would be way beyond the bounds of what we're allowed to do when you assume that the state violated every ethical boundary that's on them by not giving this memo, and we're going to just assume that that happened? Well, Judge, in terms of the memo, I think that, and I know I pointed this out in my brief, the memo itself does not appear to be written to be tendered to defense counsel, and I say that because of the final paragraph that starts out with, my impression of Steve and Heard is, and as I point out in my memo, that's sort of classic work product. The attorney is stating what she... You never assert work product when you interview a witness, and what the witness said. I agree. So now we're going to assume that they drafted this memo with the idea that they wouldn't have to tender it because it's work product, and therefore the defendant was somehow fundamentally prejudiced by it. That's a lot of assumptions that we're making. Well, Judge, and again, I would say that there is, you know, I understand, you know, 20 years later trying to prove that this was actually tendered is a difficult task, but again, there is nothing in the questioning of James Farnes or Detective Baiocchi by defense counsel to suggest that defense counsel even knew that Barnes and Heard were together when they were first interviewed, when Barnes first named Robinson. You know, but Heard maintains that he was in the same room waiting to be interviewed with Barnes. Can you explain the circumstances in which you got the 1994, the July 94 memo later? Sure. Was it in discovery? It was. Was it in post-conviction proceedings, or how did it come about? No. So when we first filed our post-conviction petition, it was based on what we were calling a likely Brady violation, and that's because during the investigation we interviewed Stephen Heard, and he told us, you know, he told us his story. He told us what happened, and that included, you know, this encounter with James Barnes and the meeting with the state's attorney. In that memo, in that interview, he did not, to my recollection, he did not tell us that he had told the state's attorney that Barnes also lied. He was talking about himself in that interview. So we filed the post-conviction petition. The state filed a motion to dismiss. We responded. The case was taken off call for a few months for review by then state's attorney, Alvarez Conditional Integrity Unit. They decided to go forward with the case. So the case was set for argument. On the morning that we were supposed to argue the motion to dismiss, post-conviction counsel handed me this memo and asked me to sign a discovery receipt for it. And I read it. Had counsel given you anything else up to that time? I'm just wondering why this particular document, if it had been already tendered, why would they decide to give this one document to you in 94? I have no idea. I was, frankly, I was a bit taken aback, and that's why I asked the judge to continue the argument because I didn't know, frankly, I didn't know what I was dealing with. I was looking at this memo from the head before that I had never seen before. And to my mind, it lent credibility to the story that Stephen Hurd had told, that I had otherwise no evidence supporting Hurd's memo other than his own word. And so this corroborated that.  But wouldn't you agree that the memo does reflect him jumping back and forth in the story? It certainly does. But, you know, again, I think that. And you have to convince us what, that it would probably change the outcome? Yes. And I think that, again, if defense counsel had had that information, and, you know, I understand it's not a certainty, but it doesn't have to be a certainty that it absolutely would change the outcome at trial. You know, what I am arguing to your honors is that with that information, defense counsel could have possibly impeached Barnes. He could have presented Steve Hurd, who would not have been the ideal witness, but could have lent, you know, some substance to how it came to pass that Barnes suddenly, when they were both in custody, names Wendell Robinson four months after the shooting death of Larry Walker. I think that given that information and, you know, what could have happened during trial, I think that it undermines the confidence in the verdict to a degree that requires it in trial. I wanted to, unless your honors have any other questions about that. I also wanted to touch briefly on the court's finding as to our case on actual innocence involving, primarily involving the repantation of James Barnes. And the court, it's a curious decision, I think, because the court finds that it's difficult to assess Barnes's credibility because his testimony was presented through videotape recantation. But he doesn't find it not credible. He just says it's difficult to assess. And the court runs through a few things that concern him. Number one, why did Barnes identify Mr. Robinson and now recant? And, you know, I think if you watch the video or you read the transcript, Barnes makes it pretty clear that he was tired of the police coming to him. He was tired of being asked about it. This was his explanation. He was tired of being questioned about this case. And so he didn't know, I mean, he wasn't friends with Wendell Robinson. And, you know, his position was the police said that they had information on this guy. It was him. I went with it to get out of the situation. Well, here's the problem. Here's what the trial court brought up. He said this was done 20 years later. Yes. There are significant discrepancies in the Barnes videotape as opposed to his trial testimony. The trial testimony was more accurate, such as where the body was and all that. So there's sworn testimony in the trial, and you have this uncross-examination statement. And the trial court said, well, I believe this sworn trial testimony more because it's more accurate in terms of details of the situation, more so than this unsworn 22-year later story that's unsworn. Well, the court did note that there were inconsistencies. And I would, and I understand Mr. Robinson was found guilty beyond reasonable doubt at trial. But I would just submit to your Honor that Mr. Barnes has always been wildly inconsistent. And, you know, I think that that's one of the problems. We're going on his word to sustain a conviction of murder, and he has been wildly inconsistent. And just a few examples are, first of all, Barnes testified at trial. On the day of the robbery, there were five people on the porch next door. He names them all. Lewis Carnell, Darnell, Trudy, Stephen Hurt. And then he says that he doesn't recall giving the names Daniel Washington. He doesn't recall giving the name Russell. He doesn't even know these people. Well, Detective Baiacci testified that, sure, he gave the names Daniel Washington and Russell the first time we interviewed him. He said that they were witnesses. They were there. In addition, sorry, I once again lost my train of thought. Mr. Barnes was inconsistent, and it's a bit complicated, about the details when he's going through the story of where people were standing and, you know, the circumstances of the shooting. He's kind of all over the place about who was on the porch, who was on the sidewalk. So I would just say that he was inconsistent. His recantation was inconsistent with his trial testimony, but his trial testimony was also internally inconsistent to a large degree. And, you know, I did want to address the sort of specter that was being sort of put over the fact that post-condition counsel interviewed Mr. Barnes in Springfield, Illinois, without anyone from the state present, and to just point out that, you know, that was part of an investigation. Our war in this case had just started. So we were investigating the case, and we interviewed Mr. Barnes. We attended all of that material. It was not a secret where he was, who was present. There was a court reporter. She's on the record. I mean, it was all very much all of the information was disclosed. And unfortunately, Mr. Barnes moved to Missouri before the hearing in this case, and I don't know of any mechanism to get him back for post-conviction testimony. But the state, as I told the trial judge, the state also interviewed him, and he stuck by his recantation. But he said he's not coming back without a warrant. So just to the degree that the circumstances of that interview are troubling to the court, it was certainly not meant to be anything untoward, and I can answer any questions about that. Do you want to wrap it up? If you want to do something real quick as a wrap-up, and you'll have some time to wrap up. You know, I just wanted to say that in terms of Stephen Hurd and his credibility as to actual innocence, that he was out at this drug spot all day. He was at the back of the lot, and Barnes says he was at the front of the lot. They were in different places, so there was some confusion about who saw who, who was present. But Hurd, in his statement to counsel before the hearing, in court at the hearing, and to the state before the hearing also, he's unequivocal that he was present, and he saw people shooting. He heard information about what other people saw, and it was not Wendell Robinson. But he also said Barnes was not present. Right, and I thought about that, Your Honor. And that's why I say Hurd, I know that Barnes said Hurd was present when he was standing on the porch next door. Hurd says, I was working, he was very specific. I was working gathering money, and I was at the back of the vacant lot. Barnes says that he was on the front porch. So it's entirely possible that Hurd isn't lying.  And just my final point on that is in terms of the credibility of Barnes' recantation and his unequivocal assertion that it was not Wendell Robinson, as I point out in our brief, my partner, Mr. Goodman, pressed Mr. Barnes again and again to give more of an answer than just I wanted to get the police off my back as to why he named Wendell Robinson in this shooting. And there was a level of frustration that was growing, and Mr. Goodman finally said, if he did it, he should be in prison, and if he didn't, he shouldn't. And Mr. Barnes responded, right. Mr. Hurd or Mr. Barnes? Mr. Barnes. He said, right, but I didn't see that man do anything. And we'd ask you, the court. Well, I'll say something about it. Well, thank you. Good morning. Good morning. Your Honors, with respect to the actual innocence claim, I just want to be clear that the trial court here did not apply the wrong standard in this case and did not consider the evidence in a piecemeal fashion. Rather, the trial court considered all of the evidence as a whole in light of the proper standard and properly determined whether the newly discovered evidence that was presented was of such a conclusive character that it would change the results on retrial. And the petitioner, I'd just like to point out, focuses on the infirmities that happened at trial. But we need to focus on the infirmities. We can't ignore the infirmities that happened at the evidentiary hearing. The trial court based his decision on those infirmities. He made credibility and weight determinations. He resolved conflicts in the evidence. And his decisions are not manifestly erroneous. So you have one eyewitness, and your one eyewitness now recants. And we're supposed to ignore that. It's not ignoring that. It's considering whether the trial court's decision, giving Barnes' recantation little weight, is manifestly erroneous. We're not asking this court to ignore anything. And in general, those recantations are viewed suspiciously. And it's important to note that this recantation was not made in court. It was not made under oath. And it was not subject to cross-examination. It was just a videotape and a transcript that was offered into evidence. And it's also important to look at the details of that recantation. And most importantly, he changed, Barnes changed the location of where the victim's body was found following the shooting. And that's not just inconsistent with what Barnes said at trial, but it's also inconsistent with the trial testimony from Henry Carley, from Officer McCullough, and it's also inconsistent with police reports that documented an interview with an employee of the liquor store in which the victim actually collapsed. Now, the location of the victim's body may not have been important at trial, but the petitioner made it an issue at this point in post-conviction proceedings when Barnes changed that location in his recantation. And that change in location goes against everything else that we have in the record, and it completely undermines the veracity of that recantation. Could we talk about the 1994 memo permit? Absolutely. Okay, state always gives you a receipt when they're tendering you anything, when they're tendering you an arrest report or any document. You get a receipt that you sign off on. We don't have any of that here. I would say, first of all, not every case involves a receipt for every document that's tendered. It did when I was practicing, but apparently things have changed. Sometimes there are, sometimes there aren't. I've seen records both ways. But I would also say that that physical memo, the letter itself, is actually irrelevant to the Brady issue. The existence of the memo and the later tendering of it doesn't mean that there was a prior Brady violation. The petitioner's argument is, I got the memo so late so there must have been a Brady violation. But it doesn't matter when PC post-conviction counsel learned about the memo. What matters is whether that public defender at the trial knew about the recantation. So the question isn't whether the memo was tendered or when the memo was tendered. What the question really is, is whether the information about that recantation was tendered to the trial attorney. And the trial court found that the public defender was aware of the recantation. And there are certainly reasonable inferences that can be drawn from the record that support that trial court's finding, especially where the inferences are to be drawn in favor of the state. That decision by the trial court was not manifestly erroneous. The trial court found that Mr. Nichols knew about the recantation? Yes. What was that based on? I'm sorry? What was that based on? So what the record shows and what the trial court based its finding on is that the state had two conversations with H.E.R.D. in June of 1994, June 14th. The first one was between H.E.R.D. and A.S.A. Andrews where he said that we both concocted. And then the later one was with A.S.A. McCarthy present. That was June 14th of 1994. Then the assistant public defender, Nichols, had a conversation in court with H.E.R.D. on July 6th of 1994. And the PD says on that day that I had an earlier conversation with H.E.R.D. We don't know the exact date, but I'd like to talk with him again for a few minutes. It's all on the record. He has a conversation with him and then decides he's not going to call him as a witness. The inference is that the PD spoke with him on July 6th because that information had been disclosed by the state after the conversation on June 14th. It's reasonable to infer that the state had the conversation with H.E.R.D., told the PD about it, and the PD explored those same topics with H.E.R.D. That's what the trial court's findings were. It's presumably why the PD spoke with H.E.R.D. again on July 6th. The record supports that there was that type of communication between the state and the defense. Again, that the state had the conversation with H.E.R.D. on June 14th, told the PD about it. The trial court did not find that Mr. Nichols knew about the recantation. That's not the right way to say it, is it? The trial court reasoned, speculated, whatever word I think your adversary would say you speculated, but whatever, the trial judge was teasing it all out, as I read it, and was saying, well, we know H.E.R.D. was there. We knew that he had a chance to talk to him. I would have expected that it would have come up in the conversation. Isn't that basically what the trial court said? It's not really a factual finding. That was what the judge was thinking, right? The trial court said that. One of the findings was that he, that H.E.R.D., when he had the conversation with H.E.R.D., that H.E.R.D. would have said the same things to the public defender that the state, that he said to the state. But if you look at the chronology of events, there's the inference, a reasonable inference that can be drawn, and a natural conclusion that can be drawn from what we have in the record, is that the state had that conversation in June, let the public defender know, and then on the very next court date, the public defender had a conversation with H.E.R.D. So it's reasonable to infer all of that happened the next day. Well, if he were still recanting, he would have called him as his first witness. That would have been the best witness. But he went and talked to him, and the guy's story is clearly matching up with the state's, and that's why he's not calling him. I would beg to differ that he'd be a great witness to call. I think a trial strategy decision, whether if he recanted to the public defender, he's still not a great witness. H.E.R.D. was all over the place with his statements. Well, he's a terrible witness. I'll agree with you, but he might have been the only one to have. Well, except that the information that would have come out, that H.E.R.D. would have been impeached no matter who called him. But importantly, H.E.R.D.'s statement to the detectives, the handwritten statement where he identified the petitioner as the shooter, if H.E.R.D. had testified, that would have come in as substantive evidence. It's absolutely reasonable that a seasoned trial attorney would not call this person as a witness. It could have done more harm than good in their case, and it's a trial strategy decision. But a trial strategy decision may be without all the information. Not according to what we can glean from the record. From the record, the inferences that can be drawn, the inferences that should be drawn in favor of the state, are that the state informed the public defender about this and the public defender had that conversation with H.E.R.D. exploring the same topics. Do you think that July 1994 memo should have been turned over? The memo itself, the actual letter, I would argue is work product. The information within the memo about the recantation was discoverable, and there's no indication anywhere in the record that that information wasn't tendered. There is no indication in the record that it was. Absolutely. That's true. There's no affirmative evidence either way, whether it was tendered or not, through no fault of anybody. But the burden is not on the state at this point to show that it was tendered. The burden is on the defense. Burdens aside, most of the time, I always thought that receipts were given whenever it was turned over. Justice Burke has more experience in the criminal courts than I do, and she seems to think that that's how it worked. If you say it doesn't always work that way, that's fine. I'm sure it doesn't universally 100 percent of the time work that way. But if that's the norm and we don't have it here, does that not say anything to you at all? And I would argue again that it's not the norm. If we had had that recantation when we filed our answer to discovery, then that recantation should have been in the answer to discovery. But in this case, the recantation came later. And we do have a continuing obligation to disclose, but not necessarily in written form. Rule 415 doesn't identify, doesn't specify whether that information has to be relayed verbally or in written form. And it's very easy. It's an easy inference to make. It's a very rational, reasonable inference to make, given how pre-trial proceedings occur at the trial court level, that the state's attorney just verbally told the public defender about that recant, which is why at the next court date the public defender said, I spoke with him, but I'd like a few more minutes to speak with him. And after speaking with him again, saying, you know what, we still don't want to call him as a witness, knowing full well that if he had put him on with the recantation, that prior handwritten statement incriminating his client, not making it just one ID of, one strong ID of the, by Barnes of his witness, corroborated by Carley, corroborated by Officer McCullough, but then you're putting also Hurd's ID on him too. He wasn't- Do you think the reason that counsel, Mr. Nichols, wanted to talk to Hurd was because he had probably been already alerted to the fact of a recantation? Absolutely. Okay, that day he talked to him, that was the day he was brought in on a material witness warrant, right? No, no, he was brought in, he was in court the previous day. On June 13th, he didn't show up. On June 14th, he did show up. July 6th, you're right, I apologize. He was there pursuant to the warrant. So the state brings him in on a material witness warrant, they talk to him, they come out and they say, we don't want him anymore. Any defense attorney worth his salt would say, you know what, I want to go talk to that guy. The state doesn't like him anymore, maybe I like him, right? I mean, couldn't that just as easily be the reason that the defense attorney would want to talk, talk to the guy? Not if you're going to make those reasonable inferences in favor of the state, and if you look at the chronology of events of what occurred. And again, Hurd was not a great witness. So the counsel had the opportunity to speak with him before. Both sides spoke with him on multiple occasions. Both sides made the conscious decision not to call him as a witness. He would have been impeached severely on either side, and we can't ignore that prior handwritten statement identifying the petitioner as the shooter that would have come in just to add more evidence, to corroborate even more of the state's evidence. Arguably, he could have been found ineffective if he had called him as a witness. There's both sides of that. But the inference is that the trial court below, the question really is whether the trial court below was manifestly erroneous in his findings. And based on this record, it's not there. The trial court, the record does support the trial court's findings. Can inferences be drawn either way? Sure. However, in this case, based on what the trial court found, based on what's in the record, it's not manifestly erroneous. And that's the standard that we're here meeting today. I'm not sure if there's any other questions with respect to the Brady violation or the alleged Brady violation. With respect to the actual innocence claim, if there's anything that you'd like me to touch on, I can certainly point out that the state's position is that the trial court was not manifestly erroneous in finding and giving Barnes' recantation little weight. Again, in addition to what we previously stated, the recantation was internally inconsistent. It was also inconsistent with Carley's identification of the petitioner as the shooter. While it's a tentative ID, and we put that forth in our brief, it is an identification nonetheless. And there's no indication anywhere in the record that Carley ever wavered from that identification since trial. Also important is that Carley corroborated Barnes' trial testimony regarding the circumstances of the shooting. And Barnes didn't come forward on his own with that recantation. He didn't recant until the petitioner's investigator contacted him. And it's true that the recantation was made in an undisclosed location. We're not alleging that the petitioner's attorneys did anything underhanded. However, we weren't there. We weren't notified. And therefore, that statement was not subjected to cross-examination. But all of these points show that the trial court's finding that giving Barnes' recantation little weight is supported by the record and is not manifestly erroneous. Counsel, is there no way to have brought that gentleman back to Illinois? He could have been brought in as a material witness, but there's no indication in the record that the defense ever tried to do that. And you interviewed him? Not maybe you. I did not. But the state did. The state traveled to interview him? The Conviction Integrity Unit, yes, did do that. The Conviction Integrity Unit did. I don't have any information about that interview, but I understand that it did occur. And why don't you have any information about that? Well, I do. Did they not produce it? Not part of the record that we have. Did they produce information, whether it's part of the record or not? I don't know how they operate when they make findings. Not to me. Not to me. But if there are no other questions, I'm just looking to see if there's anything I needed to point on. I would like to point on one more thing regarding the petitioner's argument that Heard was a credible witness because his testimony was consistent, she said, with three things, that being that there was a robbery of a drug spot, that there were multiple shooters, and that someone was killed. We would argue that those are pretty vague things, and there's inconsistencies in that regard as well. For instance, the drug spot. Was it on the porch or was it in a passout line in a vacant lot? As for several shooters, was it three, as Cox had said, was it five, as Barnes has said? And the fact that somebody was killed, we know that. But, again, the more important question is the detail about where the victim's body was found. So we would point out that Heard is not a credible witness at all. As previously stated, he wouldn't have been a good witness for the defense at all. But if there are no other questions, the people would rest on its brief and respectfully request this Honorable Court to affirm the trial court's denial of the post-conviction petition. Thank you very much. Thanks. I want to focus on just a few points. First, the issue of whether the trial court found that defense counsel had the memo. The trial court found that it was, quote, not clear one way or the other as to whether the memo was turned over, but then reasoned that because defense counsel spoke to Heard, that it was logical that Heard would have told defense counsel that he met with the State. Not that it was reasonable or logical that the State would have already told him, but that Heard would have just on his own told defense counsel that, and for reasons we've already discussed, I would say that that is not a reasonable inference. And to Your Honor's question of whether there is a report of the State's interview with Mr. Barnes in Missouri, there is. It was tendered in discovery in June of 2014, late June of 2014. Could you have brought him in? It's my understanding that we could not. I mean, we don't have the same power as the State, and this is not a criminal case. I mean, it is a post-conviction case, but it is not a continuation of a criminal case, in the sense the case law is very clear on. And because we don't have compulsory process, an out-of-State witness, it is my understanding that if they don't want to come, you cannot, a defense counsel in this particular situation cannot have a warrant issued by a sheriff in another State to bring a witness in. I did a considerable amount of research on that, trying to figure out how to bring him in, and I came up with nothing. In terms of Mr. Barnes not coming forward on his own, you know, again, I would just say that's not typically what happens. I understand it can happen, but, you know, it's not a prerequisite. A post-conviction counsel investigate cases all the time. And I guess I just wanted to end with the trial court's denial. While he did deny our petition, he denied our relief, it does not appear to be – it doesn't appear that he found Mr. Barnes to be not credible. He based his decision on the fact that he couldn't tell, it was difficult to assess, and some other issues. And I would just say that, you know, this is incredibly important. I mean, as your honors know, this is a first-degree murder trial, and we have one person. This conviction hinges on the testimony at trial of one person who has now come forward and said, without hesitation, it was not Wendell Robinson. I lied. You know, when we hear these cases, there are many of them where we would say, I might have made a different ruling than the trial court made. But on this appeal, we're limited by the standard of review. Correct. In order to reverse, we have to find that the trial court's decision was manifestly a ruling. Correct. And what that means is that the opposite decision is clearly evident. If you're writing this for us and you want us to say that this trial court's decision was clearly erroneous, how would you state that? I would say that the conviction in this case hinges on the testimony of one person. That person has now recanted. And I try to imagine, frankly, a trial right now. One of the efforts that the court made, though, he said that's not credible. He did not say it was not credible. Respectfully, he said that it was difficult for him to assess Barnes's credibility. But he did not say that Barnes was not credible. And so, you know, in my mind, it follows that it's not based on the evidence. It's not reasonable to then say a new trial is not warranted. If you can't determine, if the trial judge could not determine that Mr. Barnes was not credible, then he's saying that he accepts part of his recantation as credible. And if he's saying he can't decide, he can't determine, then it sort of leaves it up in the air. And, you know, trying to imagine this case going to trial right now, I mean, you know, again, we've got a burden of proof beyond a reasonable doubt. We have one eyewitness who has now recanted. And I just don't see, you know, how the judge did it. It is my position that it was unreasonable for the judge to say, I don't necessarily find this witness to be not credible. Nevertheless, I'm going to deny a new trial, even though he is the only witness to have ever identified the petitioner as the person who shot Larry Walker. And we would respectfully ask that this Court reverse the trial court's judgment. Thank you. Thank you. Thank you to both of you. Very well presented in the briefs and today. We'll take a matter under advisement and we'll stand adjourned.